UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LAURICE A. WHITE,

                              Plaintiff,

              v.                                                    7:05-CV-1013
                                                                   (GLS/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

LAWRENCE D. HASSELER, ESQ., Attorney for Plaintiff
WILLIAM H. PEASE, ESQ., Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## REPORT AND RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance

with General Order 18 of the Northern District.

## PROCEDURAL HISTORY

        Plaintiff protectively filed an application for supplemental security income

("SSI") and disability insurance benefits ("DIB") on May 16, 2003.  (Administrative

Transcript ("T") at 25, 52).  The application was denied initially and Plaintiff

requested a hearing.  (T. at 31, 166, 170).  A hearing was held before an

Administrative Law Judge ("ALJ") on January 21, 2005.  (T. at 198-224).  In a

decision dated February 24, 2005, the ALJ found that plaintiff was not disabled.  (T.

at 10-23).  The ALJ's decision became the final decision of the Commissioner when

the Appeals Council denied plaintiff's request for review on June 27, 2005.  (T. at 9).

## CONTENTIONS

Plaintiff makes the following claims:

(1) The Commissioner failed to properly consider and weigh the opinion of Plaintiff's treating physicians.  (Pl.'s Br., Dkt. No. 6, at 13-16).

(2) The Commissioner failed to follow the required steps in considering Plaintiff's alleged mental impairment.  (Pl.'s Br. at 16-19).

(3) The Commissioner failed to properly assess Plaintiff's residual functional capacity ("RFC").  (Pl.'s Br. at 19-21).

(4) The Commissioner's conclusion that there is significant work in the national economy that Plaintiff can perform is not supported by substantial evidence. (Pl.'s Br. at 21-23).

(5) The Commissioner failed to properly assess Plaintiff's credibility.  (Pl.'s Br. at 23-25).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.  (Defendant's Br., Dkt. No. 8, at 1-28).

## FACTS

A.    **Non-Medical Evidence and Testimony:**

Plaintiff, who was forty years old at the time of the ALJ's hearing, finished high school and has past relevant work experience as a waitress, supervisor, and clerk.  (T. 14, 52).  Plaintiff testified that she last worked on December 18, 2004 as a cashier.  (T. 204).  She stated that she has constant back pain and trouble sleeping as

a result.  (T. 206).  Plaintiff stated that her "disks [have] deteriorated" and she has arthritis in her spine.  (T. 206).  She stated that her "right leg still gives out" (T. 206) causing her to lose her balance and fall (T. 207).  She testified that she takes Ambien as a sleep aid and Lipitor for anemia, and that in the past she has been treated with Fentanyl patches, Darvocet, and Hydrocodone for pain.  (T. 208-09).  She testified that at the time of the hearing she was not taking any of these pain medications because of the side effects.  *Id.*

Plaintiff testified that she is depressed and has difficulty concentrating.  (T. 210).  In terms of daily activities, she testified that she is able to bathe and dress herself, prepare meals with assistance, grocery shop with a motorized cart, drive about twice per week, watch television, read, and write poetry.  (T. 210-13).  She stated that she is able to sit for about an hour and a half, stand for a half-hour, walk for fifteen to twenty minutes, and lift a "couple" of pounds at a time.  (T. 212-13).

**B.** **Medical Evidence**

    **1.** **Treating Sources**

        **a.** **Dr. Luc Perrier**

Plaintiff saw treating physician Dr. Luc Perrier on December 30, 1999, complaining of right knee pain as a result of a fall.  (T. 82).  Upon physical examination, Plaintiff's knee had a full range of motion ("ROM"), and Plaintiff reported severe pain upon palpation although there was no evidence of swelling.  *Id.*

Plaintiff had normal reflexes, no obvious numbness and no weakness.  *Id.*  Dr. Perrier declined to recommend an X-ray because of an absence of joint effusion.  *Id.*  He prescribed Darvocet and referred Plaintiff to physical therapy for ROM, exercise and antalgic measures.  *Id.*  Plaintiff returned to Dr. Perrier on January 20, 2000, at which point he noted a full ROM and no swelling, joint effusion, or instability.  (T. 83).  Reflexes, strength and sensitivity were normal, there were no signs of root irritation or disc herniation, and palpation of the lower back was "slightly sensitive."  *Id.*

On February 14, 2000 Dr. Perrier noted that Plaintiff had been seen for back pain over the last few years, and that an MRI obtained in 1999 was "basically benign."  (T. 84).  Dr. Perrier noted an MRI taken more recently, which had shown moderate posterior disc bulging with superimposed central to right paracentral disc herniation at L5-S1 and indentation of the spinal cord.  *Id.*  Dr. Perrier referred Plaintiff to a spinal surgeon to determine whether she would be a good candidate for surgery.  *Id.*

Plaintiff next appeared to see Dr. Perrier on March 4, 2003, some three years after her last visit.  (T. 85).  Dr. Perrier noted that Plaintiff had undergone spinal surgery and had been doing well over the few months preceding the appointment, but that she reported that her symptoms were recurring.  *Id.*  On physical examination, Plaintiff had decreased Achilles reflexes on the left side, normal strength, normal sensation, and normal vascular examination except for decreased pulse on the left

side.  *Id.*  Plaintiff complained of pain to palpation of the surgical scar.  *Id.*  Dr.

Perrier recommended another MRI.  *Id.*

On March 17, 2003, Dr. Perrier reviewed the results of the most recent MRI,

which showed an epidural scar within the right epidural space at L5-S1; no evidence

of recurrent disc herniation, small central disc bulge at L4-L5; and an enlarged uterus

due to a large fibroid within.  (T. 86).  Dr. Perrier recommended that Plaintiff have

the gynecological problem addressed, and noted that if the symptoms persisted after

this he would recommend reevaluation by a spinal surgeon.  *Id.*

### b.     Claxton-Hepburn Medical Center

An MRI from Claxton-Hepburn Medical Center dated February 10, 2000

found moderate posterior disc bulging with superimposed central to right paracentral

disc herniation at L5-S1 with indentation of the spinal canal.  (T. 88).  This,

combined with degenerative chances of the facet joints, produced secondary spinal

stenosis.  *Id.*

Another MRI, dated March 6, 2003, found an enlarged uterus which appeared

to be filled with a large fibroid, as well as enhancing epidural scar within the right

epidural space at L5-S1 seen both anteriorly and posteriorly, no evidence of recurrent

disc herniation, a small central disc bulge at L4-5 and a very small central disc bulge

at T12-L1.  (T. 90-91).

Plaintiff was admitted to the Claxton-Hepburn Medical Center on May 17,

5

2003 and discharged on May 23, 2003.  (T. 92-96).  She was admitted because she had threatened to kill herself, wrote a suicidal note to her boyfriend and "goodbyes" to her children.  (T. 92).  Her hospital stay was described as medically "unremarkable," although she was convinced to take Effexor for her depressive symptoms.  *Id.*  According to the treatment notes, she reported improving very quickly on this medication and agreed to continue taking it after discharge.  *Id.*

On October 2, 2003, Plaintiff presented to the Claxton-Hepburn Medical Center for a hysterectomy.  (T. 97).  She did well post-operatively and was sent home on pain medication.  *Id.*

An MRI was performed on March 23, 2004, and showed moderate degenerative changes at L5-S1, with no spondylolysis or spondylolisthesis, and properly aligned lumbar vertebra.  (T. 158).  A CT scan of the lumbar spine found degenerative changes with mild to moderate secondary spinal stenosis and neural foraminal stenosis.  (T. 159).

### c.   St. Lawrence Psychiatric Center

Plaintiff followed up at the St. Lawrence Psychiatric Center on May 27, 2003. (T. 111-13).  She reported feeling much improved since her discharge from Claxton-Hepburn Medical Center.  (T. 111).  She scored in the minimal range on the Beck Depression Inventory II.  *Id.*  She reported feeling anxiety and scored a six on the Beck Anxiety Scale.  *Id.*  Plaintiff missed her next appointment and when contacted

reported that she was "doing OK" and that she did not want to reschedule.  (T. 113).

          **d.**  **Dr. Bruce Fredrickson - Professor of Orthopedics and Neurologic Surgeon - S.U.N.Y. Upstate**

At the request of Dr. Perrier, Dr. Bruce Fredrickson performed a consultative orthopedic examination on March 10, 2000.  (T. 103-04).  Upon examination, Plaintiff showed some tenderness across the lumbosacral junction on the right side and normal heel/toe gait.  *Id.*  On May 12, 2000, Dr. Fredrickson performed a right L5-S1 discectomy.  (T. 105).  On June 23, 2000, Dr. Fredrickson noted that plaintiff's pain had "definitely improved."  (T. 108).  He stated that he would keep plaintiff disabled for another four to six weeks, at which point she could return to a job which did not require any heavy work.  *Id.*

Plaintiff saw Dr. Fredrickson again approximately three years later on August 6, 2003.  *Id.*  She complained of increased chronic low back pain which was aggravated with activities and staying in the same position for any period of time.  *Id.*  Upon physical examination, Plaintiff showed significant paraspinal muscle spasm and an antalgic gait, but normal heel/toe progression and intact neurological examination, with the exception that the right lower extremity was decreased to touch in pin prick compared to the left side.  *Id.*  Her reflexes were symmetric at 2+ and hip and knee ROM was free.  *Id.*  Dr. Fredrickson opined that Plaintiff suffered from a discogenic pain syndrome and that it was not going to be resolved with surgery.  *Id.*  He recommended a more conservative approach with regular exercise

regimens and anti-inflammatories.  *Id.*

### e.  **Dr. Federico Loinaz**

Plaintiff saw Dr. Federico Loinaz on December 12, 2003.  (T. 151-57).
Plaintiff reported to Dr. Loinaz that she suffered from chronic back pain.  (T. 152).
He noted that she was in no pain and had an essentially normal physical examination.
*Id.*  He recommended a second opinion on her spinal condition and prescribed
Fentanyl patches for pain control.  (T. 153).  On December 22, 2003, Plaintiff
reported that she was feeling better with the Fentanyl patch.  *Id.*

Dr. Loinaz completed a medical report for employment purposes on January 5,
2005.  (T. 160-65).  He stated that Plaintiff had limitations working in high, humid,
or wet places, that she could sit and stand for two hours and walk for one-half hour in
an eight-hour workday, occasionally lift up to ten pounds, and occasionally bend,
squat, crawl, and climb.  (T. 160-61).  He stated that she had no limitations in
grasping, pushing/pulling, and fine manipulation.  (T. 161).  He opined that she was
"not able to work for the time being."  *Id.*

### 2.  **Examining Sources**

### a.  **Richard Williams, Ph.D.**

Plaintiff saw Richard Williams, Ph.D., a clinical psychologist, for a
psychological evaluation on August 5, 2003.  (T. 114-16).  Dr. Williams found that
Plaintiff was alert and oriented, with good attention, concentration, mental control,

memory, and abstract thinking.  (T. 115).  Her judgment and insight were fair.  *Id.*

Her mood was sad when she talked about her mother's death, but otherwise her mood

was good and her affect was appropriate.  *Id.*  Dr. Williams concluded that Plaintiff

was "coping fairly well with her chronic pain, recent health problems, and the

relationship breakup."  (T. 116).  He opined that her mood was not depressed, but

that she would benefit from counseling because she seemed very eager to talk about

her problems.  *Id.*

### b.    <u>Dr. Gerald Amatucci</u> - **Family Practice Associates P.C.** **Carthage, New York**

Plaintiff was examined by Dr. Gerald Amatucci on September 4, 2003.  (T.

117-19).  Upon physical examination, Plaintiff had a normal ROM and no tenderness

or spasm of the cervical and thoracic spine.  (T. 118).  She had a "reasonably good"

ROM of her lumbosacral spine, with no areas of tenderness and no deformity.  *Id.*  A

supine straight leg raising ("SLR") was positive at 25-30 degrees bilaterally because

she stopped due to pain in the lower back, but she had a normal gait and station and

otherwise no obvious difficulties with the examination.  (T. 118-19).  Her shoulders,

wrists, and hands showed full ROM and full strength bilaterally.  (T. 118).  There

was also a full ROM and no abnormalities in the extremities, as well as a normal

neurological examination demonstrating full motor strength and equal reflexes

throughout.  (T. 119).  Dr. Amatucci concluded that his objective findings were

consistent with a "mild decrease in capacity regarding activities that would strain the

lower back[, which would] include squatting, bending and stooping for long periods." *Id.*  Plaintiff reported that she wanted to be ***vocationally retrained*** to go into mortuary sciences.  *Id.*

> c.   <u>Dr. Sarosh Quereshy</u> - **Physical Medicine & Rehabilitation Carthage, New York**

Plaintiff was examined by Dr. Sarosh Quereshy on December 5, 2003.  (T. 149-50).  Dr. Quereshy found that Plaintiff had a slightly to moderately decreased ROM of the lumbar spine, lumbar paraspinal tenderness, normal motor strength, normal sensory exam in the lower extremities, equal reflexes in all extremities, sciatic notch tenderness in the buttock region, and a positive right SLR test.  (T. 149).  Dr. Quereshy administered a nerve block injection on December 5, 2003, and reported that plaintiff received some relief after the injection.  (T. 150).

> d.   <u>Alan Mirly</u> - **Fletcher Allen Health Care, University of Vermont College of Medicine**

Plaintiff was examined by Physician's Assistant Alan Mirly on April 16, 2004.  (T. 178-80).  Upon physical examination, he noted full ranges of motion in the neck, upper extremities, lumbar spine and lower extremities.  (T. 179).  Reflexes were symmetric and she had full strength throughout.  *Id.*  SLR was negative.  *Id.*  P.A. Mirley noted claudication (pain due to poor circulation) in the right leg as well as radicular symptoms in the right thigh and back pain originating at L4-5 or L5-S1.  *Id.*

### e.   **Dr. Michael Borrello - Fletcher Allen Health Care**

Dr. Michael Borrello examined Plaintiff on June 1, 2004.  (T. 185-86).

Plaintiff was found to have intact motor function of the lower extremities, negative

SLR bilaterally, antalgic gait, symmetric reflexes, pain to facet stressing at the L4-5

and L5-S1 levels, and no evidence of sacroiliac dysfunction.  (T. 186).  Dr. Borrello

performed a nerve block injection on June 1, 2004.  *Id.*

### 3.   **Physical Residual Functional Capacity Assessment**

A physical RFC assessment was completed by non-examining state agency

physician Dr. Roeder on December 3, 2003.  (T. 143-48).  This assessment found that

Plaintiff retained the RFC to lift twenty pounds occasionally and ten pounds

frequently; sit, stand, and/or walk for about six hours in an eight-hour workday; and

push and/or pull to the extent indicated by her lifting restrictions.  (T. 144).  She was

found to have no postural, manipulative, visual, communicative, or environmental

limitations.  (T. 145-46).  Dr. Amatucci's finding that Plaintiff was only mildly

limited as to her physical capacities, including squatting, bending, and stooping for

long periods of time, was adopted as consistent with the medical findings.  (T. 147).

### DISCUSSION

### A.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months . . . ." 42

U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether, based solely
> on medical evidence, the claimant has an impairment which meets or equals the
> criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has
> such an impairment, the [Commissioner] will consider him disabled without
> considering vocational factors such as age, education, and work experience; . . . .
> Assuming the claimant does not have listed impairment, the fourth inquiry is
> whether, despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there is other work which
> the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**B.   Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on*

*behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It

must be "more than a scintilla" of evidence scattered throughout the administrative

record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated*

*Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by

substantial evidence, a reviewing court considers the whole record, examining the

evidence from both sides, because an analysis of the substantiality of the evidence

must also include that which detracts from its weight." *William*s, 859 F.2d at 258.

However, a reviewing court cannot substitute its interpretation of the administrative

record for that of the Commissioner if the record contains substantial support for the

ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also*

*Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212

(1983).

## C.   <u>Treating Physician</u>

Plaintiff argues that the opinion of Dr. Loinaz, her treating physician, should

have been given controlling weight.  (Pl.'s Br. at 13-16).  On January 5, 2005, Dr.

Loinaz opined that Plaintiff could sit and stand for two hours and walk for one-half

hour in an eight-hour workday; occasionally lift up to ten pounds; occasionally bend,

squat, crawl, and climb; and had no limitations in grasping, pushing/pulling, and fine

manipulation.  (T. 160-61).  He opined that she was "not able to work for the time

being." (T. 161).  Other than the January 5, 2005 statement, the only treatment notes in the record from Dr. Loinaz are dated December 12, 2003 through December 22, 2003.  (T. 151-57).

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is not required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If the treating physician's opinion is not given controlling weight, the ALJ must assess the following factors: the length of the treatment relationship; the frequency of examination for the condition in question; the medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; the qualifications of the treating physician; and other factors tending to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6).  Failure to follow the proper standard is a ground for reversal.  *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (citation omitted).

In this case, the ALJ considered Dr. Loinaz's January 2005 opinion but assigned it less than controlling weight because he deemed it inconsistent with the medical record as a whole as well as Dr. Loinaz's own treatment notes. (T. 19). The Court finds that this determination was proper. As the ALJ noted, the medical records consistently indicated that Plaintiff had full or only mildly limited ranges of motion, normal strength throughout, normal reflexes, intact neurological exams, and very little tenderness and no deformity in the lumbosacral spine. (See T. 82-85, 105, 108, 118-19, 149, 152, 179, 186). The most recent MRIs indicated no recurrent disc herniation, no nerve root impingement, mild to moderate stenosis, no spondylolysis or spondylolisthesis, properly aligned lumbar vertebra, and only small central disc bulge at L4-5 and very small central disc bulge at T12-L1. (T. 90-91, 158-59). Moreover, Dr. Loinaz, in his January 2005 evaluation, indicated that Plaintiff's condition was improving and that her prognosis was fair. (T. 162). His own treatment notes of December 12, 2003 indicated that Plaintiff had good arterial pulses in both feet, no swelling, normal muscular strength, and no neurological findings. (T. 152). It is also noted that treatment notes from Dr. Loinaz only appear for December of 2003; the only other record from Dr. Loinaz is the January 2005 medical source statement. (T. 151-57, 160-65).

The ALJ followed the proper analysis in evaluating the June 2005 statement's consistency with other objective medical evidence as well as Dr. Loinaz's own

clinical findings and previous treatment notes. *Schisler*, 3 F.3d at 568. The ALJ's decision was based on the proper application of legal principles and is supported by substantial evidence. The Court finds no error.

**D.    Mental Impairment**

Plaintiff argues that the ALJ failed to follow the proper analysis in evaluating Plaintiff's alleged mental impairment. (Pl.'s Br. at 16-19). The ALJ in this case considered Plaintiff's affective disorder to be severe, but found that it did not rise to the level of a listed impairment under Section 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (T. 15-23).

When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow a special procedure at each level of administrative review. *See* 20 C.F.R. §§ 404.1520a, 416.920a. The Commissioner first records the pertinent signs, symptoms, findings, functional limitations, and effects of treatments contained in the record. *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1). If a mental impairment is determined to exist, the Commissioner must next indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent. *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2). In doing so the Commissioner rates the degree of functional loss resulting from the impairment – on a scale ranging from no limitation to severe limitation, the latter of which is incompatible with the ability to do

work-like functions – analyzing four specific factors, including (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) deterioration or decompensation in work or work-like settings. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

The Commissioner must then determine the severity of the mental impairment. *Id.* §§ 404.1520a(d), 416.920a(d)(2). If the Commissioner finds the claimant's medical impairment to be severe, he must determine whether it meets or equals a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). In the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC, considering whether he or she is limited in the ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – to such a degree as to reduce his or her ability to do past relevant work and other work. *See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).

An analysis of whether a mental impairment exists must be incorporated or in some way embodied within the ALJ's decision when evidence of such an impairment is presented. 20 C.F.R. §§ 404.1520a. To trigger these requirements a claimant bears the initial responsibility of providing medical evidence sufficient to indicate the potential existence of a mental impairment. *Howell v. Sullivan*, 950 F.2d 343,

348 (7th Cir. 1991) (citing 20 C.F.R. §§ 404.1508, 404.1514).

The ALJ's decision reflects that he found Plaintiff's affective disorder –
depression -- to be severe.  (T. 23).  In doing so, the ALJ considered the pertinent
signs, symptoms, findings, functional limitations, and effects of treatments contained
in the record.  (T. 15-19); *see* 20 C.F.R. §§ 404.1520a, 416.920a.  The ALJ followed
the psychiatric review technique and found that Plaintiff had no more than moderate
limitations in activities of daily living, mild difficulties in maintaining social
functioning, moderate limitations in maintaining concentration, persistence, or pace,
and no episodes of decompensation.  (T. 17); *see* 20 C.F.R. §§ 404.1520a(c)(3),
416.920a(c)(3).  The ALJ next determined that Plaintiff did not have a disorder
which met or equaled the severity of any disorder contained in the Listings.  (T. 17);
*see* 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2).  In considering Plaintiff's RFC,
the ALJ found that as a result of her mental impairment Plaintiff was limited to jobs
involving simple, routine, one- and two-step tasks.  (T. 20); *see* 20 C.F.R. §§
404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).

Plaintiff argues that the ALJ should have found that her mental impairment
either met or equaled a listed impairment, or that it resulted in more serious non-
exertional impairments with regard to her RFC.  (Pl.'s Br. at 16-19).

As to the first contention, the Court finds that the ALJ's decision that
Plaintiff's mental impairment did not meet a listing was supported by substantial

evidence in the record.  The relevant listing is Section 12.04 of 20 C.F.R. Part 404,

Subpart P, Appendix 1, "Affective Disorders."[1]  Section 12.04 states:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractability; or

---

[1] Section 12.04 states:

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.

First, the record contains no evidence that Plaintiff's depression satisfied the

requirements of Section 12.04(C).  Second, as to the requirements of subsections (A)

and (B), which are required to be present together, the record does ***not*** establish that

Plaintiff has suffered from a marked restriction in activities of daily living;

maintaining social functioning; maintaining concentration, persistence or pace; or

that she has had repeated episodes of decompensation, each of an extended duration.

The evidence indicates that Plaintiff was able to do basic daily activities such as

bathe and dress herself, as well as drive, prepare meals with assistance, grocery shop

with a motorized cart, draw, paint, read, watch television, and write poetry.  (T. 210-

13).  Additionally, psychiatric examinations found that Plaintiff was alert and

oriented, had good attention, concentration, mental control, and abstract thinking,

good mood and appropriate affect.  (T. 114-16).  When Plaintiff was discharged from

the hospital following a suicidal threat, she reported improving very quickly on

medication.  (T. 92).  The medical and other evidence establishes that the

requirements subsection (B) of Section 12.02 were not satisfied, and the ALJ's

decision that Plaintiff's condition did not rise to the level of a listed impairment is

supported by substantial evidence in the record.

　　　As to Plaintiff's contention that her non-exertional impairments were not

properly represented in the ALJ's RFC determination, the Court finds that substantial

evidence supports the ALJ's decision that Plaintiff was limited to jobs involving

simple, one- and two-step tasks.  Plaintiff testified that she had difficulty

concentrating, and there is some evidence in the record that she suffered from anxiety and depression.  (*See* T. 111).  There is no additional evidence which would indicate more restrictive non-exertional impairments.

The decision reflects that the ALJ followed the proper analysis in considering Plaintiff's mental impairment.  There is substantial evidence supporting the ALJ's decision.

## E.   **Residual Functional Capacity**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545; 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, No. 97-CV-456, 1998 WL 743706, at *3 (N.D.N.Y. Oct. 23, 1998); *LaPorta*, 737 F. Supp. at 183.

In this case, the ALJ found that Plaintiff retains the RFC to perform a significant range of sedentary work.[2]  Specifically, the ALJ found that Plaintiff could

---

[2] To find a residual functional capacity for sedentary work, the Commissioner must find that a individual is able to lift at least ten pounds at a time, carrying articles like files, ledgers, and small tools.  20 C.F.R. § 404.1567(a); SSR 96-9p, 1996 WL 374185, at *3.  An individual must be able to sit for at least six hours, with only routine breaks.  SSR 96-9p, at *6.  A morning break, a lunch period, and an afternoon break at approximately two-hour intervals constitute routine breaks.  *Id.; see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)(noting that

lift and carry ten pounds occasionally and light items frequently; sit for six hours and stand and walk for two hours in an eight-hour workday with a sit/stand option every thirty minutes; occasionally stair and ramp climb, stoop, kneel, crouch and crawl; avoid vibrations and hazards such as machinery and heights; and perform simple, routine, one- and two-step tasks.  (T. 20).

Plaintiff argues that this RFC assessment was erroneous.  (Pl.'s Br. at 19-21). To the extent that Plaintiff bases this argument on the contention that Dr. Loinaz's January 2005 opinion should have been controlling weight, the Court has already found that the ALJ properly weighed this opinion.

Plaintiff also contends that the ALJ's finding that Plaintiff requires the option of alternating sitting and standing erodes the base of sedentary work and therefore renders Plaintiff unable to perform any degree of sedentary work.  (Pl.'s Br. at 20). This specific issue is dealt with in Social Security Ruling 99-6p, *Determining Capability to Do Other Work: Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 1996 WL 374185, *7 (S.S.A. 1996):

> **Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly,

---

sedentary work does not require an individual to remain motionless for six hours).  An individual must also be able to walk and stand for up to two hours.  SSR 96-9p, at *6.

In this case, the ALJ found that Plaintiff was able to perform a significant range of sedentary work.  (T. 20-22).  It is noted that on page 20 of the Administrative Transcript (page 8 of the ALJ's decision), the ALJ referred to a "significant range of *light* work."  (T. 20) (emphasis added).  Because of the context of the decision, which refers to sedentary work throughout, and the ALJ's RFC determination, which is consistent with a significant range of sedentary, not light, work, the Court concludes that this statement by the ALJ was an inadvertent and harmless error.

walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

Thus, while a finding that a plaintiff has an alternate sit/stand requirement does indicate that the occupational base for a full range of sedentary work is eroded, it does not necessarily mandate that the claimant is unable to perform *any* other work.

In this case, the ALJ made the specific finding that Plaintiff must have an option to sit or stand every thirty minutes.  (T. 20).  He posed this fact to the vocational expert ("VE") in his hypothetical questions.  (T. 219-223).  The VE responded that, considering all of the facts given by the ALJ including the alternate sit/stand option, Plaintiff would be able to perform work existing in significant numbers in the national economy.  *Id.*  The ALJ was entitled to rely on the VE's conclusions to this effect.  *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp.2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966.  The ALJ's reliance on the VE will be more fully discussed at Point F ("Work in the National Economy") below.

For the reasons discussed above, the Court concludes that the ALJ's RFC determination was supported by substantial evidence.

## F.   <u>Work in the National Economy</u>

Plaintiff contends that the ALJ erroneously relied on the Medical-Vocational Guidelines, or "Grids" (20 C.F.R. Part 404, Subpart P, Appendix 2), as a framework for his decision, and that he posed inaccurate hypothetical questions to the VE.  (Pl.'s Br. at 21-23).

The ALJ referenced the Medical-Vocational Guidelines in his decision, but based his ultimate determination of whether Plaintiff could perform work in the national economy on the VE's testimony.  (T. 20-21).  The ALJ was entitled to rely on the Grids as a *framework* for his decision, and correctly elicited the testimony of a VE in order to help him determine whether there were a significant number of jobs in the national economy that Plaintiff could perform.  *See* 20 C.F.R. §§ 404.1569a(d), 416.969a(d).

It is well-established that elicitation of testimony from a vocational expert is a proper means of fulfilling the agency's burden at step five of the disability test to establish the existence of jobs that plaintiff is capable of performing in sufficient numbers in the national and regional economy.  *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp.2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing

*Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966.  Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  If the factors set forth in the hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability.  *Id.*

In this case, the ALJ based his determination that Plaintiff could perform work in the national economy on the VE's response to his second hypothetical, which incorporated the ALJ's full RFC determination.  (T. 222).  Because the Court has found that the ALJ's RFC determination was supported by substantial evidence, the ALJ's reliance on the VE's conclusion was proper.  *Varley*, 820 F.2d at 779.

## G.  <u>Credibility</u>

The ALJ has discretion to appraise the credibility of witnesses, including testimony of a plaintiff concerning subjective complaints of pain.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984).  After considering a claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2007); *Martone*, 70 F. Supp. 2d at 151.

If the ALJ rejects a claimant's subjective testimony, he or she must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987). Where the ALJ's findings are supported by substantial evidence, the reviewing court must uphold the ALJ's decision to discount Plaintiff's subjective complaints of pain. *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citing *McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701 (2d Cir. 1980).

The ALJ in this case determined that Plaintiff's allegations of pain and other limitations were not fully credible, because they were inconsistent with the record as a whole. (T. 18-19). The ALJ noted Plaintiff's daily activities, which included watching television, dressing and bathing herself, preparing meals and performing limited household chores, and grocery shopping with the use of a motorized cart. (T. 18, 210-13). The ALJ also considered his own observations of Plaintiff at the hearing, where she was able to move about and use her arms and legs in a satisfactory manner. (T. 18). The ALJ also noted that Plaintiff had commented to Dr. Amatucci that she wished to pursue a career in mortuary sciences, and that she had returned to work as a waitress and cashier in December of 2004, working thirty hours per week but ultimately quitting because of her functional restrictions. (T. 18-

19, 119, 204-05).  While this indicated that Plaintiff could not perform past work, the

ALJ concluded that it indicated an ability to work at a lesser exertional level.  (T.

19).  Finally, the ALJ considered the objective medical evidence, which showed that

Plaintiff had only mild to moderate degenerative changes of the lumbar spine

accompanied by no motor loss or atrophy, associated muscle weakness, sensory or

reflex loss, and that Plaintiff was improving with treatment and had a fair prognosis.

(T. 19-20, 82-85, 90-91, 105, 108, 118-19, 149, 152, 158-59, 162, 179, 186).

The ALJ's analysis of Plaintiff's credibility is thorough and the ALJ's reasons

for discounting Plaintiff's credibility are readily apparent from a review of the

decision.  Thus, the Court will not recommend remand on this basis.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision denying disability

benefits be **AFFIRMED** and Plaintiff's complaint be **DISMISSED**; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-

Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to

file written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: March 4, 2008
      Syracuse, New York

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge